**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| EUGENE GADSON | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. <u>3:16CV00882</u> |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
|     Defendant. | ) | |

<u>**COMPLAINT**</u>

EUGENE GADSON, by counsel, states as follows for his Complaint against the Defendant, United States of America:

<u>**Jurisdiction and Venue**</u>

1.      This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

2.      In compliance with 28 U.S.C. § 2675, Eugene Gadson ("Mr. Gadson") submitted a notice of administrative claim with the Department of Veteran Affairs ("VA"), which is attached as Exhibit A.  That claim was received by the VA Office of Chief Counsel on March 15, 2016. After further investigation, Mr. Gadson submitted an amended claim on June 9, 2016, which is attached as Exhibit B.

3.      The VA Office of Chief Counsel denied Mr. Gadson's claim on August 24, 2016.

4.      Accordingly, Mr. Gadson's claim is ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

5.      Mr. Gadson certifies that he is fully compliant with Virginia Code § 8.01-20.1.

6.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the cause of action arose within the Eastern District of Virginia, Richmond Division, at the Hunter Holmes McGuire VA Medical Center ("McGuire VAMC") in Richmond, Virginia.

7.      Plaintiff, Mr. Gadson, is an adult resident of the Commonwealth of Virginia.

8.      At all times relevant to this action, the United States owned and operated the McGuire VAMC.

9.      At all times relevant to this action, the agents, servants, employees and personnel of the United States were acting within the course and scope of their employment in providing medical care and treatment to Mr. Gadson.  Mr. Gadson was a veteran of the United States Army and was entitled to such care and treatment at the McGuire VAMC and its affiliated outpatient care centers.

10.     The medical care described as follows was provided to Mr. Gadson at the McGuire VAMC and/or its affiliated clinics unless otherwise stated.

## Allegations

11.     Mr. Gadson restates and re-alleges paragraphs 1 through 10 as if fully stated herein.

12.     Mr. Gadson is a 34-year-old Army veteran who has suffered testicular loss, permanent neurological damage, infertility, and disability following a vasovasostomy (reverse vasectomy) performed in a negligent manner by his healthcare providers at the McGuire VAMC on August 20, 2015.

13.     During the spring of 2015, Mr. Gadson, then 33 years old, decided that he wanted to start a family with his newlywed wife, Ahlece Leerdam-Gadson ("Mrs. Leerdam-Gadson"). However, in 2009 Mr. Gadson had undergone a vasectomy.

14.    In an effort to regain his fertility, Mr. Gadson met with doctors at the McGuire VAMC in May 2015 to discuss his options. During a May 1, 2015 meeting with two McGuire VAMC doctors, Joseph Reza Habibi, M.D. and John T. Roseman, M.D., Mr. Gadson decided to undergo a vasovasostomy to reverse the effects of his earlier vasectomy and regain his ability to conceive children.

15.    During pre-operative testing, no abnormalities were identified or communicated to Mr. Gadson to indicate there were conditions creating an elevated risk for his vasovasostomy.

16.    Upon information and belief, prior to August 20, 2015, the United States, through its agents, servants or employees at the McGuire VAMC and its affiliates, selected Adam P. Klausner, M.D. ("Dr. Klausner"), Dr. Shaoqin Zhou ("Dr. Zhou"), and Jay Edmund Sulek, M.D. ("Dr. Sulek") to perform Mr. Gadson's vasovasostomy.

17.    Upon information and belief, neither Dr. Klausner, nor Dr. Zhou, nor Dr. Sulek was qualified to perform Mr. Gadson's vasovasostomy.

18.    Upon information and belief, neither Dr. Klausner, nor Dr. Zhou, nor Dr. Sulek was a fellowship-trained microsurgeon.

19.    Upon information and belief, Dr. Klausner had not performed more than ten vasovasostomies in the twelve months preceding Mr. Gadson's vasovasostomy.

20.    Upon information and belief, Dr. Zhou had not performed more than ten vasovasostomies in the twelve months preceding Mr. Gadson's vasovasostomy.

21.    Upon information and belief, Dr. Sulek had not performed more than ten vasovasostomies in the twelve months preceding Mr. Gadson's vasovasostomy.

22.    On the morning of August 20, 2015, Mr. Gadson presented to the McGuire VAMC for his vasovasostomy.

23.     At approximately 6:53 a.m., Dr. Sulek authored a Urology Pre-Op Note, co-signed at 6:28 p.m. by Dr. Klausner, an attending surgeon – almost seven hours after Mr. Gadson's surgery was completed.

24.     Nearly an hour after signing the Urology Pre-Op Note, at 7:41 a.m., Dr. Sulek wrote an Addendum to his note.

25.     This Addendum, among other things, describes a first person exchange with Mr. Gadson, in which Dr. Sulek claims:  "I told [Mr. Gadson] that he has to be sure that this is what he really wants given that it is a purely elective surgery with significant risks[.]"

26.     Mr. Gadson and Mrs. Leerdam-Gadson, who were both present during the pre-operative consent meetings, have no recollection of such a discussion with Dr. Sulek or anyone else prior to the surgery. Mr. Gadson and Mrs. Leerdam-Gadson both assert that they never met or spoke with Dr. Sulek prior to the surgery.

27.     The surgery ran approximately one hour over the projected two-hour time.

28.     From approximately 8:52 a.m. until 11:42 a.m., on August 20, 2016, Dr. Zhou and Dr. Klausner performed a bilateral vasovasostomy on Mr. Gadson.

29.     Over the course of Mr. Gadson's vasovasostomy, medical providers at McGuire VAMC, including Dr. Klausner, Dr. Zhou, and Dr. Sulek, made a series of mistakes that not only caused Mr. Gadson's injuries, but also reflect their lack of qualifications to have performed his vasovasostomy.

30.     As the first mistake during the procedure, neither Dr. Klausner, nor Dr. Zhou, nor Dr. Sulek used an operating microscope for the vasal dissection.

31.     When performing a vasal dissection, the standard of care is to use an operating microscope.

32.     Upon information and belief, as of August 20, 2015, Dr. Klausner did not know or believe that using an operating microscope when performing a vasal dissection lowers the risk of complications, including arterial damage.

33.     Upon information and belief, as of August 20, 2015, Dr. Zhou did not know or believe that using an operating microscope when performing a vasal dissection lowers the risk of complications, including arterial damage.

34.     Upon information and belief, as of August 20, 2015, Dr. Sulek did not know or believe that using an operating microscope when performing a vasal dissection lowers the risk of complications, including arterial damage.

35.     By not using an operating microscope for the vasal dissection, Dr. Klausner, Dr. Zhou, and Dr. Sulek elevated Mr. Gadson's risk of injury to his vasal arteries.

36.     As the second mistake during the procedure, Dr. Zhou and/or Dr. Klausner excised the vasal clips and the atretic segments without using an operating microscope.

37.     When excising vasal clips during a vasovasostomy, the standard of care is to use magnification to identify vasculature and avoid injury.

38.     Upon information and belief, as of August 20, 2015, Dr. Klausner did not know or believe that using magnification when excising vasal clips during a vasovasostomy reduced the risk of arterial injury to the patient.

39.     Upon information and belief, as of August 20, 2015, Dr. Zhou did not know or believe that using magnification when excising vasal clips during a vasovasostomy reduced the risk of arterial injury to the patient.

40.     Upon information and belief, as of August 20, 2015, Dr. Sulek did not know or believe that using magnification when excising vasal clips during a vasovasostomy reduced the risk of arterial injury to the patient.

41.     By not using a microscope when excising the vasal clips from Mr. Gadson's vas deferens, Dr. Zhou and/or Dr. Klausner created an elevated risk of injury to Mr. Gadson's vasal arteries and spermatic cord.

42.     As a third mistake during the procedure, Dr. Klausner and/or Dr. Zhou used a bovie cauterization device during the dissection of Mr. Gadson's vas deferens.

43.     When dissecting a patient's vas deferens during a vasovasostomy, the standard of care is to use bipolar cauterization, not bovie electrocautery.

44.     Upon information and belief, as of August 20, 2015, Dr. Klausner did not know or believe that, when dissecting a patient's vas deferens during a vasovasostomy, using bipolar cauterization, instead of electrocautery, reduces the risk of arterial damage during surgery.

45.     Upon information and belief, as of August 20, 2015, Dr. Zhou did not know or believe that, when dissecting a patient's vas deferens during a vasovasostomy, using bipolar cauterization, instead of electrocautery, reduces the risk of arterial damage during surgery.

46.     Upon information and belief, as of August 20, 2015, Dr. Sulek did not know or believe that, when dissecting a patient's vas deferens during a vasovasostomy, using bipolar cauterization, instead of electrocautery, reduces the risk of arterial damage during surgery.

47.     Further, the Society for Assisted Reproductive Technology[1] ("SART") practice consensus specifically states that it is the standard of care to use bipolar cauterization and not electrocautery, and that electrocautery can cause vascular damage to the spermatic cord.

48.     Upon information and belief, as of August 20, 2015, Dr. Klausner did not know or believe that the SART practice consensus specifically stated that it was the standard of care to use bipolar and not electrocautery, and that electrocautery can cause vascular damage to the spermatic cord.

49.     Upon information and belief, as of August 20, 2015, Dr. Zhou did not know or believe that the SART practice consensus specifically stated that it was the standard of care to use bipolar and not electrocautery, and that electrocautery can cause vascular damage to the spermatic cord.

50.     Upon information and belief, as of August 20, 2015, Dr. Sulek did not know or believe that the SART practice consensus specifically stated that it was the standard of care to use bipolar and not electrocautery, and that electrocautery can cause vascular damage to the spermatic cord.

51.     Similarly, studies that were available at the time of Mr. Gadson's vasovasostomy on August 20, 2015 indicated that bovie electrocautery was more likely than bipolar electrocautery to transmit energy to adjacent tissue and cause arterial and/or tissue damage, especially in areas with small delicate arteries and/or tissue like the scrotal region.

52.     Upon information and belief, as of August 20, 2015, Dr. Klausner did not know or believe that bovie electrocautery was more likely than bipolar electrocautery to transmit energy

---

[1] SART is an organization which provides urologists and microsurgeons guidance on standards of care and best practices in reproductive medicine.

to adjacent tissue and cause arterial and/or tissue damage, especially in areas with small delicate arteries and/or tissue like the scrotal region.

53.     Upon information and belief, as of August 20, 2015, Dr. Zhou did not know or believe that bovie electrocautery was more likely than bipolar electrocautery to transmit energy to adjacent tissue and cause arterial and/or tissue damage, especially in areas with small delicate arteries and/or tissue like the scrotal region.

54.     Upon information and belief, as of August 20, 2015, Dr. Sulek did not know or believe that bovie electrocautery was more likely than bipolar electrocautery to transmit energy to adjacent tissue and cause arterial and/or tissue damage, especially in areas with small delicate arteries and/or tissue like the scrotal region.

55.     By using electrocautery instead of bipolar cauterization, Dr. Klausner, Dr. Zhou, and/or Dr. Sulek created an elevated risk of arterial and/or tissue damage in Mr. Gadson's scrotal region.

56.     As a fourth mistake during the reconstruction portion of the procedure, Dr. Klausner, Dr. Zhou, and/or other medical providers at McGuire VAMC failed to examine Mr. Gadson's vasal fluid for the presence of sperm.

57.     During the reconstruction portion of a vasovasostomy, the standard of care requires that the vasal fluid be examined microscopically for the identification of sperm.

58.     Upon information and belief, as of August 20, 2015, Dr. Klausner did not know or believe that, during the reconstruction portion of a vasovasostomy, microscopically examining vasal fluid for the identification of sperm decreases the risk of post-operative infertility by enabling surgeons to correct errors in the vasovasostomy before completing the procedure.

59.     Upon information and belief, as of August 20, 2015, Dr. Zhou did not know or believe that, during the reconstruction portion of a vasovasostomy, microscopically examining vasal fluid for the identification of sperm decreases the risk of post-operative infertility by enabling surgeons to correct errors in the vasovasostomy before completing the procedure.

60.     Upon information and belief, as of August 20, 2015, Dr. Sulek did not know or believe that, during the reconstruction portion of a vasovasostomy, microscopically examining vasal fluid for the identification of sperm decreases the risk of post-operative infertility by enabling surgeons to correct errors in the vasovasostomy before completing the procedure.

61.     By failing to microscopically examine Mr. Gadson's vasal fluid for the identification of sperm during his vasovasostomy on August 20, 2015, Dr. Klausner, Dr. Zhou, and Dr. Sulek failed to reduce the risk of post-operative infertility.

62.     As a fifth mistake during the procedure, Dr. Klausner and/or Dr. Zhou suspected that Mr. Gadson had suffered a vascular injury, but failed to administer an intraoperative Doppler to examine the blood flow to Mr. Gadson's left testicle before finishing the operation.

63.     Further, upon information and belief, no other medical providers at McGuire VAMC, in addition to Dr. Klausner, Dr. Zhou, and Dr. Sulek, performed an intraoperative Doppler to examine the blood flow to Mr. Gadson's left testicle.

64.     If a vascular injury or compromise is suspected during a vasovasostomy, the standard of care requires a medical provider to use a Doppler ultrasonic probe.

65.     Upon information and belief, as of August 20, 2015, Dr. Klausner knew or believed that, if a vascular injury or compromise is suspected during a vasovasostomy, using a Doppler ultrasonic probe enables a medical provider to accurately assess whether a testicle is receiving adequate blood flow with greater reliability than visual examination.

66.     Upon information and belief, as of August 20, 2015, Dr. Zhou knew or believed that, if a vascular injury or compromise is suspected during a vasovasostomy, using a Doppler ultrasonic probe enables a medical provider to accurately assess whether a testicle is receiving adequate blood flow with greater reliability than visual examination.

67.     Upon information and belief, as of August 20, 2015, Dr. Sulek knew or believed that, if a vascular injury or compromise is suspected during a vasovasostomy, using a Doppler ultrasonic probe enables a medical provider to accurately assess whether a testicle is receiving adequate blood flow.

68.     Experienced microsurgeons and surgeons who attempt microsurgical reconstruction should be comfortable with the use of intraoperative Microtip Doppler.

69.     Upon information and belief, Dr. Klausner knew how to use an intraoperative Microtip Doppler on August 20, 2015.

70.     Upon information and belief, Dr. Zhou knew how to use an intraoperative Microtip Doppler on August 20, 2015.

71.     Upon information and belief, Dr. Sulek knew how to use an intraoperative Microtip Doppler on August 20, 2015.

72.     An intraoperative Microtip Doppler was available to Dr. Klausner, Dr. Zhou, and/or Dr. Sulek during Mr. Gadson's vasovasostomy at the McGuire VAMC on August 20, 2015.

73.     By not using an intraoperative Microtip Doppler, neither Dr. Klausner, nor Dr. Zhou, nor Dr. Sulek was able to determine whether Mr. Gadson had suffered arterial damage during the procedure.

74.     Because neither Dr. Klausner, nor Dr. Zhou, nor Dr. Sulek identified Mr. Gadson's intraoperative arterial damage, they did not surgically correct the arterial damage caused by the procedure.

75.     The United States, through its agents, servants or employees at the McGuire VAMC and its affiliates, was aware or should have been aware of the foregoing deficiencies in the training and ability of Dr. Klausner, Dr. Zhou, and Dr. Sulek to perform Mr. Gadson's vasovasostomy.

76.     By selecting Dr. Klausner, Dr. Zhou, and Dr. Sulek to perform Mr. Gadson's vasovasostomy, the United States, through its agents, servants or employees at the McGuire VAMC, directly and proximately caused Mr. Gadson to receive a negligently performed vasovasostomy by surgeons who were unqualified to perform that operation.

77.     After Mr. Gadson's vasovasostomy ended, Dr. Zhou came out of surgery to discuss the operation with Mrs. Leerdam-Gadson. During this meeting, Dr. Zhou said that he and Dr. Klausner "had a little bit of an issue, but we were able to fix it."  No further explanation was offered.

78.     Curiously, the post-operative report, which both Drs. Zhou and Klausner signed, states: "Complications:  none[.]"

79.     At around 1:24 p.m. on August 20, 2015, the McGuire VAMC discharged Mr. Gadson without any information or instructions relating to complications that arose during the surgery.

80.     Further, Mr. Gadson was not scheduled for a post-operative follow-up visit until October 6, 2015 – more than six weeks after the surgery.

81.     Starting on August 21, 2015, Mr. Gadson began calling the McGuire VAMC to complain of severe pain and symptoms consistent with a hematoma.

82.     Mr. Gadson first called the McGuire VAMC at 3:40 p.m. on August 21, 2015. During this call, Nurse Jacqueline French ("Nurse French") noted that Mr. Gadson complained of pain of 8/10.  Nurse French's notes make no mention of any complications that arose during the surgery or how Mr. Gadson should monitor his symptoms in light of the surgical complications.

83.     Mr. Gadson called the McGuire VAMC again on August 22, 2015 to complain of worsening symptoms.   Again, he received no particular disclosure or instructions about complications that arose during the August 20, 2015 procedure.

84.     Finally, on August 23, 2015, Mrs. Leerdam-Gadson called the McGuire VAMC and spoke to Nurse Mollie E. Dixon ("Nurse Dixon"), who noted that Mr. Gadson "has not been able to void and is having severe pain at #10 level."   Although she saw no record of complications from his surgery three days earlier, Nurse Dixon recommended that Mr. Gadson immediately "go into the nearest hospital for medical care and medical intervention."

85.     Following Nurse Dixon's instructions, Mr. Gadson presented to Henrico Doctors' Hospital – Hanover Emergency Center, on August 23, 2015. From there, Mr. Gadson was transferred to Henrico Doctors' Hospital – Richmond Urology Department ("Richmond Urology").

86.     At Richmond Urology, Mr. Gadson was treated by David E. Rapp, M.D. ("Dr. Rapp").

87.     While trying to diagnose the cause of Mr. Gadson's extreme pain and nausea, Dr. Rapp called Dr. Klausner to discuss Mr. Gadson's vasovasostomy. During this call, Dr. Rapp

noted that Dr. Klausner "stated that he had a difficult vasectomy reversal on Thursday [August 20, 2015] in particular on the left side where the dissection was difficult and the site of the prior vasectomy was extremely low with the testicle.  He stated that there was some concern for the vascular inflow to the testicle, although at the end of the procedure, the testicle did appear viable and pink."

88.     Dr. Rapp's note described in Paragraph 86 accurately reflects what Dr. Klausner said during that call.

89.     Later, while Mr. Gadson was being treated at Richmond Urology, Dr. Rapp performed an ultrasound on Mr. Gadson's scrotum, which showed that Mr. Gadson's left testicle was "[a]bsent blood flow."

90.     Later that evening, on August 23, 2015, after Dr. Rapp reviewed the ultrasound with Mr. Gadson, Mr. Gadson agreed to undergo an operation to determine if the vascular dysfunction surrounding his left testicle could be corrected.  However, during this operation, Dr. Rapp discovered that the lack of blood flow had rendered Mr. Gadson's left testicle nonviable. Consequently, Dr. Rapp removed Mr. Gadson's left testicle via orchiectomy.

91.     Since this August 23, 2015 corrective surgery, Mr. Gadson has undergone two additional operations to correct the damage directly and proximately caused by the negligently performed operation by the McGuire VAMC personnel including, but not limited to, Dr. Zhou and Dr. Klausner on August 20, 2015.

92.      Since his August 20, 2015, Mr. Gadson had to use a cane as a direct and proximate result of the negligent operation by McGuire VAMC personnel (including, but not limited to, Dr. Zhou and Dr. Klausner) on August 20, 2015.

93.     Moreover, as a direct and proximate result of the negligent operation by the McGuire VAMC personnel (including, but not limited to, Dr. Zhou and Dr. Klausner) on August 20, 2015, Mr. Gadson could not have sexual intercourse with his wife without pain and embarrassment, including bloody discharge from his testicles.

94.     Further, as a direct and proximate result of the negligent operation by the McGuire VAMC personnel (including, but not limited to, Dr. Zhou and Dr. Klausner) on August 20, 2015, Mr. Gadson has suffered and continues to suffer from permanent neurological damage, including regular migraines and autonomic dysreflexia.

95.     As a direct and proximate result of the negligent operation by the McGuire VAMC (including, but not limited to, Dr. Zhou and Dr. Klausner) on August 20, 2015, Mr. Gadson suffered extreme arterial damage. This extreme arterial damage has rendered Mr. Gadson's remaining testicle permanently incapable of producing sperm. Mr. Gadson has been advised that he has no practicable chance to conceive his own biological children in the future.

96.     Because Mr. Gadson's urological and neurological injuries are permanent, his care has shifted to pain management. At present, Mr. Gadson is in the process of determining if a device planted near his spinal cord or his genitals, which is stimulated with a hand-held remote control, will effectively disrupt intense bouts of pain during activities, including sexual intercourse with his wife.

97.     As a direct and proximate result of the negligent operation by the McGuire VAMC personnel (including, but not limited to, Dr. Zhou and Dr. Klausner) on August 20, 2015, Mr. Gadson has not been able to work and is effectively disabled.

98.     As a direct and proximate result of the negligent operation by the McGuire VAMC personnel (including, but not limited to, Dr. Zhou and Dr. Klausner) on August 20, 2015,

Mr. Gadson has been unable to enjoy social and physical activities. As a 35 year old man who previously enjoyed watching football with his friends, lifting weights, and playing recreational sports with his stepsons, being forced into a sedentary, socially-restricted lifestyle, marked by regular and debilitating bouts of pain, has reduced his quality of life immensely.

99.     Finally, as a direct and proximate result of the negligent operation by the McGuire VAMC personnel including, but not limited to, Dr. Zhou and Dr. Klausner on August 20, 2015, Mr. Gadson has incurred over $100,000 in medical bills and lost wages.

## Negligence

100.   Mr. Gadson restates and re-alleges paragraphs 1 through 99 as if fully stated herein.

101.   As a provider of medical services to Mr. Gadson, the United States and its agents, servants or employees at the McGuire VAMC and its affiliates, including but not limited to Dr. Sulek, Dr. Klausner, and Dr. Zhou, owed Mr. Gadson a duty to provide him medical care consistent with the governing standard of medical care.

102.   Mr. Gadson alleges that the agents, servants, or employees of the United States at the McGuire VAMC and its affiliates, including but not limited to Dr. Sulek, Dr. Klausner, and Dr. Zhou, while acting within the scope of their employment, violated the applicable standards of medical care in the following respects:

a.      Negligent performance of Mr. Gadson's vasovasostomy by Dr. Klausner and Dr. Zhou, including a failure to properly supervise the surgery by Dr. Klausner, causing arterial damage to and around Mr. Gadson's left testicle;

b.      Negligent failure to correct arterial damage to and around Mr. Gadson's left testicle, caused by Drs. Klausner and Zhou during Mr. Gadson's vasovasostomy, resulting in heightened risk of hematoma and testicular loss;

c.      Negligent failure to document intra-operative complications in Mr. Gadson's medical records (including arterial damage to and around Mr. Gadson's left testicle, caused by Dr. Klausner and Dr. Zhou during Mr. Gadson's vasovasostomy), resulting in the inability of subsequent medical providers to properly identify the source of Mr. Gadson's eventual hematoma;

d.      Negligent failure to disclose intra-operative complications to Mr. Gadson (including arterial damage to and around Mr. Gadson's left testicle, caused by Dr. Klausner and Dr. Zhou during Mr. Gadson's vasovasostomy), leading Mr. Gadson to delay obtaining emergency care until August 23, 2015;

e.      Negligent failure to provide proper discharge instructions to Mr. Gadson or Mrs. Leerdam-Gadson regarding complications (including arterial damage to and around Mr. Gadson's left testicle, caused by Dr. Klausner and Dr. Zhou during Mr. Gadson's vasovasostomy), leading Mr. Gadson to delay obtaining emergency care until August 23, 2015;

f.      Negligent discharge of Mr. Gadson in light of intra-operative complications (including arterial damage to and around Mr. Gadson's left testicle caused by Dr. Klausner and Dr. Zhou during Mr. Gadson's vasovasostomy), resulting in injury to Mr. Gadson;

g.     Negligent handling of calls from Mr. Gadson relating to complaints of pain well beyond what would typically be expected with regard to the post-operative course of a patient who had undergone a vasovasostomy;

h.     Negligent failure to schedule timely follow-up to Mr. Gadson's vasovasostomy in light of the intra-operative complications (including arterial damage to and around Mr. Gadson's left testicle caused by Dr. Klausner and Dr. Zhou during Mr. Gadson's vasovasostomy), which resulted in further injury to Mr. Gadson;

i.     Negligent credentialing of Dr. Klausner, Dr. Zhou, and/or other members of the surgical team, by employees of the McGuire VAMC, causing Mr. Gadson to be negligently operated on by medical providers who were unqualified to perform Mr. Gadson's vasovasostomy in accordance with the applicable standard of care;

j.     Failure to obtain informed consent from Mr. Gadson prior to vasovasostomy; and

k.     Other negligent acts or omissions before, during, and/or subsequent to the course of treatment described above as will be developed through additional factual investigation, expert review, and discovery.

103.    As a direct and proximate result of the foregoing breaches, Mr. Gadson suffered all of the injuries described herein.

WHEREFORE, Mr. Gadson respectfully requests that the Court grant judgment in his favor against the Defendant as prayed for above in the amount of Ten Million ($10,000,000), together with prejudgment interest and any other costs as he may be lawfully entitled to recover.

Respectfully submitted,

EUGENE GADSON


*/s/ Christopher F. Quirk*
Brewster S. Rawls
VA State Bar #23604
Paul T. Walkinshaw
VA State Bar #66049
Christopher F. Quirk
VA State Bar # 88238
RAWLSMcNELIS PC
211 Rocketts Way, Suite 100
Richmond, VA  23231
Telephone: (804) 344-0038
Facsimile: (804) 782-0133
brawls@rawlsmcnelis.com
pwalkinshaw@rawlsmcnelis.com
cquirk@rawlsmcnelis.com