IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

EUGENE GADSON,

        Plaintiff,

v.                                      Civil Case No. 3:16-cv-882

UNITED STATES OF AMERICA,

        Defendant.

## OPINION

The plaintiff, Eugene Gadson, underwent a reverse vasectomy at McGuire VA Medical Center. Gadson experienced significant pain after the surgery and had his testicle removed three days later due to a lack of blood flow. Gadson has brought a negligence claim for medical malpractice under the Federal Tort Claims Act, 28 U.S.C. § 2671, and the Court held a bench trial on liability on September 18 and September 20, 2017. The parties submitted post-trial briefs and argued those briefs before the Court on November 2, 2017. Gadson fails to satisfy his burden of proof that his operating doctors violated the standard of care, and his claims fail.

## I. FACTUAL FINDINGS

Gadson had a reverse vasectomy at McGuire VA Medical Center on August 20, 2015. Drs. Adam Klausner and Shaoqing Zhou, both fellowship-trained microsurgeons, performed the surgery. During the surgery, the doctors used a standard-tip monopolar ("bovie") cauterization device at a setting of 30 on the skin and a micro needletip at a setting of 15 on and around the spermatic cord. Medical records indicate that the doctors set the electrocautery settings to a "range" of 30, but no evidence suggests that a range of 30 meant that the doctors used the bovie at 30 the whole time. Further, undisputed testimony by Nurse Kathleen Childress revealed the

practice of the doctors in a reverse vasectomy: they use a bovie at a setting of 30 on the skin but at a lower level when dissecting the vas deferens from the spermatic cord. The doctors did not use the bovie to cut tissue; they only used the device to coagulate tissue and stop bleeding.

For each testicle, the doctors dissected the spermatic cord to locate the two ends of the vas deferens that had been cut and clipped during Gadson's vasectomy. The doctors found that Gadson's vasectomy had occurred in an area called the convoluted vas deferens, a difficult area to see during a reversal procedure. The doctors removed the clips that had been placed on the ends of the vas deferens during the vasectomy. Next, the doctors used an operating microscope to reconnect the vas deferens (called an "anastomosis"). At some point during the procedure, the doctors experienced some kind of hiccup causing concern for blood flow to the testicle, but the doctors visually examined the testicles' color, consistency, and turgor to ensure blood flow just before closing the surgical openings and ending the procedure. The doctors closed the surgery about one hour after they dissected the vas deferens. The doctors did not use a Doppler ultrasound to check for blood flow.

Following the surgery, Gadson experienced significant pain and discomfort. The hospital records conflict with Gadson and his wife's recollection of the events. Hospital records indicate that Gadson had a pain level of zero out of ten upon discharge from the hospital the same day as the reverse vasectomy, but Gadson and his wife recall significant pain. In any event, the doctors had given Gadson strong pain medication for the surgery, perhaps accounting for a low pain level at discharge. The day after the surgery, a nurse from the hospital called Gadson, and he reported an eight out of ten pain level, but also said that he felt "fair." Gadson testified at trial that he actually told the nurse that he felt fair considering the fact that he was not dead, but the records do not indicate that response. The follow-up report also indicates that Gadson could eat,

did not have nausea or vomiting, had continued swelling, and had no drainage. Gadson called the hospital on the second day after surgery complaining of pain, but the hospital records do not reflect this call and Gadson said that nobody instructed him to take any action based on his complaints. On the third day after surgery, Gadson called the hospital again, complaining of ten out of ten pain. A nurse told Gadson to go immediately to the nearest hospital. Gadson went to Henrico Doctors' Hospital, where Dr. David Rapp removed Gadson's left testicle after discovering that a lack of blood flow had left it nonviable.

## II. <u>LEGAL CONCLUSIONS</u>

This Court has jurisdiction over this matter pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671–80. Venue is proper in the Eastern District of Virginia pursuant to 28 U.S.C. § 1402(b) because the surgery at issue occurred in Richmond, Virginia.

### A. *Legal Standard*

In a Federal Tort Claims Act case, the place where the negligent acts occurred provides the substantive law for the claims. *Starns v. United States*, 923 F.2d 34, 37 (4th Cir. 1991). In Virginia, a medical malpractice plaintiff must prove, by a preponderance of the evidence: "(1) the applicable standard of care, (2) a breach of that standard of care, and (3) that this breach proximately caused plaintiff's injuries." *Parker v. United States*, 475 F. Supp. 2d 594, 598 (E.D. Va.), *aff'd*, 251 F. App'x 818 (4th Cir. 2007) (citing *Bryan v. Burt*, 254 Va. 28, 34, 486 S.E.2d 536, 539-40 (1997)).

Virginia's standard of care requires a doctor to use the "degree of skill and diligence in the diagnosis and treatment of the patient which is employed by a reasonably prudent practitioner in the physician's field of practice or specialty." *Bryan*, 254 Va. at 34, 486 S.E.2d at 539 (citing Va. Code § 8.01-581.20) (other citation omitted). "A physician is neither an insurer of diagnosis

and treatment nor is the physician held to the highest degree of care known to the profession. The mere fact that the physician has failed to effect a cure or that the diagnosis and treatment have been detrimental to the patient's health does not raise a presumption of negligence." *Id.*

## B. Standard of Care

This case comes down to a battle of two highly successful, skilled physicians who present two entirely different pictures of what the standard of care in Virginia requires. Gadson's expert, Karen Boyle, M.D., has performed thousands of reverse vasectomies and the Court does not question her impressive credentials. Dr. Boyle testified at trial that the standard of care requires (1) the use of a bipolar cautery device at a low setting below 30, (2) the use of an operating microscope while dissecting the spermatic cord and the vas deferens, (3) the use of a Doppler ultrasound to check blood flow after a suspected injury, and (4) patient follow-up when a patient has eight out of ten pain the day after a reverse vasectomy. Gadson claims that Drs. Zhou and Klausner breached the standard of care as to each of the deficiencies outlined by Dr. Boyle.

The defendant's expert, Raymond Costabile, M.D., has likewise performed thousands of reverse vasectomies and serves as the Chair of Urology at the University of Virginia School of Medicine. Dr. Costabile presented a completely different picture of the standard of care, saying that (1) the use of a monopolar or bipolar cautery device is mere surgeon preference and that a setting of 30 could be justified, (2) an operating microscope is not always necessary and depends upon the surgeon's specific need to see during a surgery, (3) a Doppler ultrasound is unnecessary to determine blood flow to the testicle because restricted blood flow can be seen almost immediately with the naked eye, and (4) post-operative pain in the range of eight out of ten would not cause alarm or require any particular response.

4

The Court cannot say that either Dr. Costabile or Dr. Boyle is more credible as to the standard of care required, and Gadson therefore fails to establish by a preponderance of the evidence that Drs. Zhou and Klausner violated the standard of care during the reverse vasectomy.

### i. *Cautery Devices and Strength Levels*

Dr. Costabile presents strong evidence that the standard of care does not require surgeons to use bipolar cautery during a reverse vasectomy, and the attempts by Gadson to impeach Dr. Costabile fail. Medical literature—including some authored by Dr. Costabile—lists a bipolar cautery device as either suggested or necessary to perform reverse vasectomies or vasoepididymostomies. Dr. Costabile explained, however, that (1) the literature requires bipolar cautery only for a vasoepididymostomy but not for a reverse vasectomy, (2) the choice of monopolar versus bipolar cautery amounts to mere surgeon preference for reverse vasectomies, (3) he learned at both the University of Virginia and Walter Reed Army Medical Center to use a monopolar device; (4) he teaches fellows at the University of Virginia to use monopolar cautery devices during reverse vasectomies, and (5) he himself uses exclusively monopolar bovie devices when performing reverse vasectomies. The lack of medical literature supporting his technique cuts slightly against Dr. Costabile, but he explains that the literature does not intend to cover all possible ways of performing a surgery and that only a vasoepididymostomy requires bipolar cautery. Overall, the tension between the literature and Dr. Costabile's testimony does not destroy his credibility or establish that a reasonably prudent practitioner cannot use monopolar cautery.

On the whole, although Dr. Boyle has her opinions and does things her way, Dr. Costabile certainly represents a reasonably prudent practitioner who performs his surgeries another way and trains new surgeons to do the same. Given this split of expert opinions, Gadson

fails to show that a reasonably prudent practitioner would not use monopolar cautery during a reverse vasectomy.

Moving to the cautery setting, Gadson claims that Drs. Klausner and Zhou violated the standard of care by using cautery at a setting of 30 throughout the surgery. This claim fails because the medical records indicate a "range" of 30, which undercuts the argument that the doctors must have used that setting the entire time. In fact, Nurse Childress believably testified that the doctors' standard practice involved reducing the cautery setting to 15 while operating on the spermatic cord. Even if the doctors did use a setting of 30 the entire time, Dr. Costabile testified that this would not necessarily violate the standard of care. On these facts, Gadson fails to show by a preponderance of the evidence that the doctors used the bovie at a setting of 30 or that the standard of care requires a physician to use cautery at a level below 30.

### ii. *Use of an Operating Microscope*

The experts again provide conflicting evidence on the standard of care required when using an operating microscope during a reverse vasectomy. Dr. Boyle testified that a doctor must use an operating microscope not only when performing the anastomosis but also in the prior steps of dissecting the spermatic cord and the vas deferens. Dr. Costabile testified that the standard of care does not require the use of a microscope so long as a doctor can adequately see. Dr. Boyle explained the cellular-level process involved in reconnecting the vas during the anastomosis, but the evidence shows that Drs. Klausner and Zhou used an operating microscope for that portion of the surgery. Based on the competing testimony of Drs. Boyle and Costabile, Gadson fails to show that the standard of care requires a doctor to use the operating microscope during vassal dissection, and his claim fails.

### iii. *Doppler Ultrasound*

Gadson again fails to meet his burden of proof based on the conflicting views of the parties' experts. Dr. Boyle testified that the standard of care requires the use of a Doppler ultrasound to assess blood flow when a doctor has concerns about adequate blood flow during a surgery. Dr. Boyle said that visual inspection of the testicle would not adequately show blood flow because it would take hours for the testicle to change color in the event of insufficient flow. Dr. Costabile disagreed, testifying that the color would change almost immediately in the event of blood flow restriction. Because of this relatively immediate change in color, Dr. Costabile said that doctors can and do rely on the color of an organ and its turgor to confirm adequate blood supply. To support this statement, Dr. Costabile noted that a testicle changes color almost immediately when he clamps the spermatic cord temporarily during cancer treatment.

In light of Dr. Costabile's testimony on the length of time it takes for a testicle to change color after a blood-supply cutoff and the general practice of doctors in using visual inspection to evaluate blood flow, Gadson's claim fails. Dr. Klausner reported to Dr. Rapp that he visually inspected the testicle before closing up the surgery. According to Gadson's expert, Dr. Boyle, the injury occurred during the vassal dissection, and approximately one hour passed between the dissection and the close of the surgery. The Court finds Dr. Costabile's specific testimony on the issue more reliable, and Gadson fails to prove that the standard of care forbids visual inspection for assessing blood flow based on the facts in this case. While the better practice may be to use a Doppler ultrasound, Gadson has failed to show that the standard of care requires it.

### iv. *Post-Operation Follow-Up*

Whether Gadson's post-operative pain required follow-up again depends on the two competing standards presented by Drs. Boyle and Costabile. An August 21, 2015, hospital

record shows that Gadson felt fair, could eat without problems, had no nausea or drainage, had a pain level of eight, and said that his medication provided relief. On those facts, Dr. Boyle said that she would have called the patient to bring him back to the hospital. On the same facts, Dr. Costabile said that this would not concern him based on his experience. With equally credible doctors providing opposite viewpoints on the standard of care regarding patient follow-up, Gadson has not met his burden of showing that the doctors breached the standard of care by not following up with him sooner.

## III. CONCLUSION

Gadson fails to prove by a preponderance of the evidence that Drs. Zhou and Klausner violated any standard of care while performing Gadson's reverse vasectomy given the diametrically opposed opinions of the two experts in this case. The Court dismisses the case.

Let the Clerk send a copy of this Opinion to all counsel of record. An appropriate Final Order shall issue.

/s/
John A. Gibney, Jr.
United States District Judge

Date: December 12, 2017
Richmond, VA

8